**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00781-NYW

NANCY CAHEY,

     Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

     Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

     This matter comes before the court on Defendant's Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") filed on March 26, 2021. [Doc. 35]. The undersigned considers the Motion pursuant to 28 U.S.C. § 636(c) and the Order of Reference for all purposes dated June 11, 2020. *See* [Doc. 13]. Upon review of the Motion and associated briefing, the applicable case law, and the record before the court, the court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, the Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

**PROCEDURAL BACKGROUND**

     Plaintiff Nancy Cahey ("Ms. Cahey" or "Plaintiff") initiated this civil action against her employer, Defendant International Business Machines Corporation ("IBM" or "Defendant") on March 23, 2020. *See* [Doc. 1].[1] Ms. Cahey raised the following claims under Colorado law:

---

[1] The Complaint originally named Kevin Williams, in addition to Ms. Cahey, as a Plaintiff in this matter. *See* [Doc. 1]. On September 1, 2020, this court severed Mr. Williams's claims from this action and transferred his claims to the United States District Court for the Northern District of

(1) fraudulent misrepresentations and omissions/concealment ("Claim 1"); (2) negligent misrepresentation ("Claim 2"); (3) quantum meruit ("Claim 3"); (4) unjust enrichment ("Claim 4"); (5) violation of the Colorado Wage Claim Act ("Claim 5"); (6) declaratory judgment ("Claim 6"); (7) breach of contract, asserted in the alternative ("Claim 7"); and (8) though styled as a claim, punitive/exemplary damages ("Claim 8"). *See generally* [*id.*].

On May 26, 2020, IBM filed a Motion to Dismiss, arguing that Plaintiff's claims should be dismissed for failure to state a claim under Rule 12(b)(6). [Doc. 8]. This court granted the Motion to Dismiss in part on September 1, 2020, dismissing Ms. Cahey's Claims 1, 2, and 7 and striking Ms. Cahey's Claim 8, but denying the Motion to Dismiss as to Claims 3, 4, 5, and 6. [Doc. 29 at 34]. On March 26, 2021, IBM filed the instant Motion for Summary Judgment, seeking judgment in its favor on Ms. Cahey's remaining claims: quantum meruit, unjust enrichment, a violation of the Colorado Wage Claim Act, and the declaratory judgment claim. [Doc. 35]. Plaintiff responded to the Motion on May 7, 2021, [Doc. 46], and Defendant has since replied. [Doc. 50]. Because the Motion is ripe for disposition, I consider the Parties' arguments below.

## UNDISPUTED MATERIAL FACTS

The court draws the following material facts from the record before the court.[2]

---

Georgia upon finding that transfer of those claims served the convenience of the parties and witnesses and was in the interest of justice. [Doc. 29 at 14, 34].

[2] The court includes only those undisputed facts which are material to the instant Motion. In some instances, a Party has attempted to dispute the proffered material fact, but an examination of the record finds that such dispute is not properly supported by evidence in the record or is otherwise improper. Where that is the case, the court has noted the purported dispute and its analysis. But at the outset, the court notes that both Parties failed to comply with this court's Practice Standards in their summary judgment briefing. The Practice Standards provide that "[a]ll responses must contain a Response to Statement of Material Facts section that must admit or deny each identified fact **with citations to evidence in the record**." NYW Civ. Practice Standard 56.1 (emphasis added). In addition, the Practice Standards state that, to the extent that a response contains a Statement of Additional Material Facts, "all replies **must . . . respond to said facts with citations to specific evidence in the record**, but may not include any additional facts not already offered in

1.      Ms. Cahey began working for IBM in February 2016 as an Enterprise Content Management Sales Manager.  [Doc. 35-1 at 21:24-22:3; 26:10-12;[3] Doc. 46 at 1].[4]

2.      After approximately six months as an Enterprise Content Management Sales Manager, Ms. Cahey became the Analytics Portfolio Sales Manager, through which she was a first-line manager of sales representatives.  [Doc. 35-1 at 22:19-23:3; Doc. 46 at 1].

3.      In her role as a sales manager, Ms. Cahey received a salary and commissions.  [Doc. 35-1 at 27:14-17; Doc. 46 at 1].

4.      Plaintiff received an Incentive Plan Letter ("IPL") twice per year, the first letter covering the first half of the year and the second letter covering the latter half of the year.  [Doc. 35-1 at 28:18-25; Doc. 46 at 1].

5.      Plaintiff was required to read the terms of the IPL and accept the IPL's terms to receive commissions.  [Doc. 35-1 at 41:7-10; 48:6-13; Doc. 46 at 1].

6.      Ms. Cahey always read the IPL.  [Doc. 35-1 at 37:25-38:5; Doc. 46 at 1].

7.      Ms. Cahey accepted the IPL governing the first half of 2019 on January 17, 2019.  [Doc. 35-1 at 44:9-12; Doc. 46 at 1].

_____

the motion or response."  *Id.* (emphasis added).  Plaintiff's Response to Statement of Material Facts section fails to cite evidence in the record with respect to its denials; Plaintiff's assertion that her denials are "explained below in detail (with citations)," [Doc. 46 at 1], does not comply with the Practice Standards.  *See* NYW Civ. Practice Standard 56.1.  Moreover, Defendant's Reply fails to respond to Plaintiff's Statement of Additional Material facts section with specific citations to record evidence.  *See* [Doc. 50].  The Parties' failure to comply with the undersigned's Practice Standards has complicated this court's ability to rule efficiently on the Motion for Summary Judgment.

[3] When citing a transcript, the court cites the document number generated by the Electronic Case Filing ("ECF") system but the page and line numbers generated by the transcript.

[4] In her Response, Ms. Cahey states that she admits the facts in IBM's Motion "with [certain] exceptions," which are noted where relevant throughout this Memorandum Opinion and Order.  [Doc. 46 at 1].

8.      The IPL defined Plaintiff's commission plan (the "Plan") as including all of the information contained in the IPL and the information contained on IBM's Worldwide Incentives Workplace ("Incentives Workplace"), which is a website.  [Doc. 35-1 at 48; Doc. 35-2 at 52:25-53:11; 95:9-11; Doc. 35-4 at 16:15-17:13; Doc. 46 at 1].

9.      Plaintiff's IPL contained a link to the Incentives Workplace.  [Doc. 35-1 at 48; Doc. 46 at 1].

10.      Ms. Cahey admits that her commission payments were governed by the IPL and the Incentives Workplace together.  [Doc. 35-1 at 29:21-25; Doc. 46 at 1].

11.      The IPL provided that IBM could adjust or require repayment of incentive payments erroneously paid out, and that "[d]epending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released."  [Doc. 35-1 at 49; Doc. 46 at 1].

12.      The IPL contained language that applied to certain salespersons, but not others. [Doc. 46-4 at 28:6-29:23; Doc. 50].[5]

13.      In her IPL, Ms. Cahey authorized IBM to deduct any debit balance resulting from an incorrect commission payment.  [Doc. 35-1 at 49; Doc. 46 at 1].

14.      Ms. Cahey's IPL for the second half of 2019, the first half of 2020, and the second half of 2020 all contained this authorization from Plaintiff.  [Doc. 35-1 at 45:20-47:18, 48:3-50:13; Doc. 46 at 1].

---

[5] IBM did not respond to Plaintiff's asserted fact in her Statement of Additional Material Facts, *see* [Doc. 50], and thus this fact is deemed undisputed.  *See* Fed. R. Civ. P. 56(e)(2) (permitting a court to consider a fact that a party "fails to properly address" as "undisputed for the purposes of the motion").

15.     In the first half of 2019, Ms. Cahey was on an incentive plan known as the Individual Quota Plan ("IQP").  [Doc. 35-3 at 28:14-16; Doc. 46 at 1].

16.     The Incentives Workplace contained a PowerPoint presentation that was applicable to IQPs in the first half of 2019.  [Doc. 35-1 79:21-80:9; *id.* at 51; Doc. 35-2 at 37:15-38:16; Doc. Doc. 46-1].

17.     The IQP PowerPoint stated that sellers on IQPs were eligible to receive incremental incentives and referred sellers to the Incentives Workplace for additional details on those incremental incentives.  [Doc. 35-1 at 54; Doc. 46 at 1].

18.     The Incentives Workplace also contained Quota Setting Guidelines ("QSG"). [Doc. 35-2 at 35:25-36:20; Doc. 35-3 at 48:8-15; Doc. 46 at 1].[6]

19.     The QSG applicable to the first half of 2019 contained the following provision (the "QSG Provision"):

> For contracts with transactional revenue or [Annual Contract Value at Provisioning] greater than [$10 million], the achievement will be removed from everyone and all applicable elements, including those on FREV and pool plans.  The $10M threshold will be based on the sum of all brands included in the contract agreement.

[Doc. 35-3 at 52:14-20; Doc. 37 at 8; Doc. 46 at 1].

20.     This version of the QSG was the first version to contain the QSG Provision.  [Doc. 46-4 at 52:17-53:4; Doc. 50].[7]

---

[6] Plaintiff stated at her deposition that she "did not see [the QSG] on [the Incentives Workplace]" and indicated that, at the time of her deposition, she "[did] not believe [the QSG] was there."  [Doc. 35-1 at 80:11-23].  However, in her Response to Statement of Material Facts, Ms. Cahey admits this statement of fact.  [Doc. 46 at 1].  Accordingly, the court considers this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

[7] IBM did not respond to Plaintiff's asserted fact in her Statement of Additional Material Facts, *see* [Doc. 50], and thus this fact is deemed admitted.  *See* Fed. R. Civ. P. 56(e)(2).  And insofar as Plaintiff asserts that the addition of the QSG Provision was not highlighted to employees, *see* [Doc. 46 at 11], IBM did not respond to this asserted fact or dispute it, and thus, the court would typically

21.     The IQP PowerPoint did not reference the QSG Provision.  [Doc. 46-4 at 57:10-13]; Doc. 50].[8]

22.     The QSG Provision means that, for any transaction that was linked to a divestiture that was valued at over $10 million, the revenue from that transaction was removed from achievement on the Plan and any individuals who contributed to that transaction could be paid via an incremental incentive.  [Doc. 35-3 at 30:3-12; Doc. 46 at 1].

23.     The IPL did not mention the QSG Provision's $10-million threshold.  [Doc. 46-4 at 93:15-19; Doc. 50]. [9]

24.     The Incentives Workplace contained a PowerPoint presentation explaining the incremental incentive available for transactions linked to divestitures valued at over $10 million. [Doc. 35-3 at 183:2-5; Doc. 35-4 at 27:21-24; *id.* at 7; Doc. 46 at 1].

25.     Employees were required to register for the incremental incentive to receive it. [Doc. 35-1 at 31:11-14; Doc. 35-3 at 96:2-11; Doc. 46 at 1].

26.     In the first half of 2019, IBM completed a transaction with a company named HCL, which included six contracts—including two Embedded Software Agreements (the "Software

---

consider this fact undisputed.  *See* [Doc. 50]; *see also* Fed. R. Civ. P. 56(e).  However, the record evidence cited by Plaintiff does not support her assertion.  Plaintiff cites to deposition testimony of Karla Johnson, who was IBM's Director of Sales Incentives for North America and Latin America, *see* [Doc. 35 at ¶ 7; Doc. 46 at 1], in which Ms. Johnson stated that there was nothing in the QSG that would highlight the change.  *See* [Doc. 46-4 at 54:12-16].  However, this does not demonstrate that there were no other documents or conversations highlighting the change.  *See also* [*id.* at 53:8-14 (Ms. Johnson stating that she "believe[d]" the QSG Provision was highlighted to employees but "[could not] confirm.")].

[8] IBM did not respond to Plaintiff's asserted fact in her Statement of Additional Material Facts, *see* [Doc. 50], and thus this fact is deemed admitted.  *See* Fed. R. Civ. P. 56(e)(2).

[9] IBM did not respond to Plaintiff's asserted fact in her Statement of Additional Material Facts, *see* [Doc. 50], and thus this fact is deemed undisputed.  *See* Fed. R. Civ. P. 56(e)(2).

Agreements")—and which closed on June 30, 2019 (the "HCL Transaction").   [Doc. 35-3 at 102:15-103:4; 180:18-181:9; Doc. 35-2 at 66:25-67:2; Doc. 46 at 1].

27.     Because the HCL Transaction was linked to a divestiture with HCL, the QSG Provision would apply to the Transaction if the divestiture exceeded $10 million.  [Doc. 35-3 at 30:3-12; Doc. 46 at 1].

28.     In determining whether the QSG Provision applied to the HCL Transaction, IBM considered each of the six contracts individually.  [Doc. 35-3 at 180:18-181:1; Doc. 46 at 1].[10]

29.     The Software Agreements met the $10-million threshold and were therefore subject to the QSG Provision.  [Doc. 35-3 at 30:3-12; 99:14-19; Doc. 46 at 1].[11]

30.     The only way Ms. Cahey would get paid for the portion of the HCL Transaction involving the Software Agreements was if she registered for, and was approved for, the incremental incentive applicable to the HCL Transaction.  [Doc. 35-3 at 96:2-9; Doc. 35-1 at 31:11-14; Doc. 46 at 1].

---

[10] It is unclear from the Motion for Summary Judgment whether the Software Agreements themselves were valued at over $10 million, whether they were linked to a divestiture of over $10 million, or both.  *Compare* [Doc. 35 at ¶ 28 (stating that, "for transactions that were linked with a divestiture that was greater than $10 million, the revenue from those transactions was removed from achievement on the [Plan]. . . .")] *with* [*id.* at ¶ 36 ("The [Software Agreements] which were part of the 2019 HCL Transaction were over $10 million, which means Plaintiff was not entitled to achievement under her IQP plan for this portion. . . .)].  However, Plaintiff does not dispute either of these facts and, more importantly, does not dispute that the Software Agreements were subject to the QSG Provision.  *See* [Doc. 46 at 1].

[11] Plaintiff attempts to dispute Defendant's assertion of fact by stating that "the $10 million provision of the Quota Setting Guidelines did not 'apply' to Cahey, as explained below in detail (with citations)."  [Doc. 46 at 1].  However, Ms. Cahey does not dispute that the Software Agreements were worth over $10 million or that they were subject to the QSG Provision.  *See* [*id.*].  Moreover, while Ms. Cahey states that her denial is "explained in detail below (with citations)," this denial does not comply with this court's Practice Standards.  NYW Civ. Practice Standard § 56.1.  Finally, attorney argument is insufficient to create a genuine dispute of fact.  *See Openwater Safety IV, LLC v. Great Lakes Ins. SE,* 435 F. Supp. 3d 1142, 1148 n.6 (D. Colo. 2020). The court thus considers this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

31.     Ms. Cahey was not registered for the incremental incentive applicable to the HCL Transaction.  [Doc. 35-3 at 96:10-17; Doc. 46 at 1].

32.     Prior to the HCL Transaction closing, Plaintiff's manager forwarded her an email stating that, for divestitures like the HCL Transaction, commissionable revenue was not going to flow to the sales representatives, and that "this is slated to be paid in an incremental incentive." [Doc. 35-1 at 93:15-98:8; Doc. 46 at 1].

33.     IBM reviewed the HCL Transaction and the related commissions to identify any possible mistakes and "thought [the commission payment] was correct."  [Doc. 46-4 at 111:20-112:24; Doc. 50].[12]

34.     However, due to an error, achievement originally flowed to Plaintiff for the Software Agreement portion of the HCL Transaction.  [Doc. 35-3 at 30:3-32:5; Doc. 46 at 1].

35.     Thus, Plaintiff received commissions for that portion of the HCL Transaction. [Doc. 35-3 at 30:3-32:5; Doc. 46 at 1].

36.     The commission payment paid to Plaintiff was reversed upon discovery of the error, which left Ms. Cahey with a debit amount of $87,519.  [Doc. 35-3 at 30:3-32:14; 129:7-9; Doc. 46 at 1].

37.     Pursuant to the IPL, IBM began recovering the debit balance from Plaintiff's future commission payments.  [Doc. 35-3 at 32:6-14; 129:7-9; Doc. 46 at 1].

---

[12] IBM did not respond to Plaintiff's asserted fact in her Statement of Additional Material Facts, *see* [Doc. 50], and thus this fact is deemed undisputed.  *See* Fed. R. Civ. P. 56(e).  However, insofar as Plaintiff asserts that IBM conducted a review and "identified no issues with commissions on the HCL deal," [Doc. 46 at 9], the court does not find this statement supported by the record evidence cited in support.  Rather, Ms. Johnson stated at her deposition that IBM "through it was correct" but that "finance [had] made errors that [IBM] did not have visibility to or information [about]."  [Doc. 46-4 at 112:15-24].

38.     Prior to the HCL Transaction, Plaintiff knew that IBM could claw back commissions.  [Doc. 35-1 at 74:3-7; Doc. 46 at 1].

39.     However, Ms. Cahey had not seen or heard about the QSG Provision prior to IBM's reliance on it to recover a debit balance.  [Doc. 46-32 at ¶ 7; Doc. 50].[13]

40.     In November 2020, Ms. Cahey's debit balance cleared, and IBM stopped recovering any debit balance from Ms. Cahey.  [Doc. 35-1 at 36:7-13; Doc. 46 at 1].

41.     On March 23, 2020, Ms. Cahey initiated this civil action.  [Doc. 1].

**LEGAL STANDARD**

Pursuant to Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Indeed, "it is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements

---

[13] IBM did not respond to Plaintiff's asserted fact in her Statement of Additional Material Facts, *see* [Doc. 50], and thus this fact is deemed undisputed.  *See* Fed. R. Civ. P. 56(e)(2).

based on speculation, conjecture, or subjective belief are insufficient.  *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998) (explaining that the nonmovant cannot rely on "mere reargument of his case or a denial of an opponent's allegation" to defeat summary judgment).  In considering the nonmovant's evidence, the court cannot and does not weigh the evidence or determine the credibility of witnesses.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  Further, the court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a form that is admissible at trial, only the substance must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016).  Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury."  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).  At all times, the court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."  *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

## ANALYSIS

IBM seeks summary judgment on each of Ms. Cahey's remaining claims: quantum meruit, unjust enrichment, a claim under the Colorado Wage Claim Act, and the declaratory judgment claim.  *See generally* [Doc. 35].  The court addresses the merits of the Parties' arguments below.

I.      **Colorado Wage Claim Act**[14]

First, IBM seeks summary judgment on Ms. Cahey's claim under the Colorado Wage
Claim Act ("CWCA"). [*Id.* at 10]. IBM raises two arguments in support of its request: first, it
argues that the  commissions paid to Ms. Cahey were never "earned" under the CWCA because
Ms. Cahey was not entitled to that payment, [*id.* at 12]; second, it asserts that even if the
commissions were earned, IBM was permitted to deduct them. [*Id.* at 13]. In response, Ms. Cahey
argues that her CWCA claim should go to the jury because (1) the commissions were "earned"
under the terms of the IPL, [Doc. 46 at 24-25]; (2) the commissions were "earned" when IBM
clawed the commissions back, [*id.* at 24]; and (3) IBM had an established practice of always paying
full commissions, which establishes an agreement to pay the commissions "without limitations,"
and her commissions were thus earned under the Parties' agreement. [*Id.*]. As to Defendant's
second argument, Plaintiff responds that (1) there was no error in payment because the QSG
Provision "should not apply;" and (2) the CWCA does not permit changes to wages after they are
"earned." [*Id.* at 25]. The court addresses the Parties' arguments in turn.

The Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq.*, "is designed to require
employers to pay wages earned by their employees in a timely manner." *Brownlee v. Lithia
Motors, Inc.*, 49 F. Supp. 3d 875, 878 (D. Colo. 2014). The CWCA defines "wages" or
"compensation" to include "[a]ll amounts for labor or service performed by employees" that "are
earned, vested, and determinable," which includes commissions earned under "any agreement
between an employer and employee." Colo. Rev. Stat. § 8-4-101(14)(a)(I)-(II). The CWCA's
purpose is to ensure that "employers make timely payment of wages" and to "provide adequate

---

[14] The court addresses Defendant's arguments in the order in which they are presented in the
Motion for Summary Judgment. [Doc. 35].

judicial relief when employers fail to pay wages when due." *Cagle v. Mathers Family Tr.*, 295 P.3d 460, 469 (Colo. 2013) (ellipsis and internal quotation marks omitted).  To that end, the CWCA allows "[a]ny person claiming to be aggrieved by violation of any provision of [the CWCA]" to bring suit "in any court having jurisdiction over the parties[.]"  Colo. Rev. Stat. § 8-4-110(2).  However, the CWCA itself does not create any substantive rights; it establishes only the minimum requirements for how and when agreed compensation must be paid.  *Kouzmanoff v. Unum Life Ins. Co. of Am.*, 374 F. Supp. 3d 1076, 1088 (D. Colo. 2019).

### A.   Whether the Commissions Were "Earned" Under the CWCA

IBM first argues that Plaintiff's commissions were never earned because she was "[n]ever [e]ntitled to [t]hem."  [Doc. 35 at 12].  More specifically, IBM contends that it is undisputed that: (1) the IPL and the Incentives Workplace governed Plaintiff's commission payments; (2) the Incentives Workplace contained the QSG and the QSG Provision; (3) the QSG Provision removed from Plaintiff's achievement any transactions with a divestiture greater than $10 million; and (4) the Software Agreements were subject to the QSG Provision, [*id.* at 12-13], and based on these undisputed facts, Plaintiff was never entitled to earn payment for the Software Agreement portion of the HCL Transaction and any payments for that portion of the Transaction were thus never "earned."  [*Id.* at 13].  Defendant asserts that Plaintiff's CWCA claim "fails for this reason alone." [*Id.*].  Ms. Cahey responds that (1) the commissions were "earned" under the IPL, and thus the CWCA, when the customer was invoiced, [Doc. 46 at 24]; (2) the commissions were "earned" under the IPL at the end of the Plan period when her sales were measured, [*id.* at 25]; and (3) the commissions were "earned" under the terms of the IPL when IBM clawed the commissions back. [*Id.* at 24].  In the alternative, Ms. Cahey asserts that her CWCA claim "does not rise and fall with the IPL" and argues that, because IBM "had an established practice and course of conduct of

always paying full commissions, without any mention of the $10 million provision, . . . that is enough to establish an agreement to pay commissions without limitation." [*Id.*].

An employer must pay commissions "earned for labor or services performed in accordance with the terms of any agreement between an employer and employee." Colo. Rev. Stat. § 8-4-101(14)(a)(II). For purposes of the CWCA, wages or compensation are "earned, vested, and determinable when an employee has an enforceable right to receive payment for such benefits pursuant to an employment agreement." *Gomez v. Children's Hosp. Colo.*, No. 18-cv-00002-MEH, 2018 WL 3303306, at *5 (D. Colo. July 8, 2018) (citing *Fang v. Showa Entetsu, Co., Ltd.*, 91 P.3d 419, 422 (Colo. App. 2003)). Indeed, "[t]he employee's substantive right to compensation and the conditions that must be satisfied to earn such compensation remain matters of negotiation and bargaining, and are determined by the parties' employment agreement, rather than by the [CWCA]." *Barnes v. Van Schaack Mortg.*, 787 P.2d 207, 210 (Colo. App. 1990). However, as noted by the court its Order on IBM's Motion to Dismiss, although for wages to be "earned" under the CWCA, they must be earned under the applicable employment agreement, "['] earned under the employee agreement['] is not limited to compensation 'explicitly authorized by the agreement.'" *Cahey v. Int'l Bus. Machs. Corp.*, No. 20-cv-00781-NYW, 2020 WL 5203787, at *12 (D. Colo. Sept. 1, 2020) (quoting *Coldwell v. RITECorp Env't Prop. Sols.*, No. 16-cv-01998-NYW, 2018 WL 5043904, at *5 (D. Colo. Oct. 17, 2018)).

Here, the Parties' dispute concerns, in part, whether Ms. Cahey "earned" wages that IBM argues were expressly removed from compensation eligibility. *See* [Doc. 35 at 12-13; Doc. 46 24]. When parties are in dispute as to whether wages or commissions subject to certain conditions or restrictions were "earned" under an employment agreement, courts have considered whether the agreement provides conditions on when an employee is first entitled to payment or, in the

alternative, whether the agreement provides conditions on when the employee may be paid wages to which she is *already* entitled.  For example, in *Barnes*, the employment agreement in question included a provision providing that, if the plaintiff were to terminate his employment with the defendant, he "[would] not receive origination fees for loans, whether approved or not, which close[d] subsequent to the last day of the month in which termination occur[ed]."  787 P.2d at 209. The Colorado Court of Appeals described this provision as an "express[] and unequivocal[]" statement that the plaintiff was "entitled to incentive fee commissions only if he generated loan applications that resulted in loan closures during the calendar month when his employment terminate[d]," but that he was "not entitled to receive incentive fee commissions on loan applications . . . that did not result in loan closings within the month when his employment terminated."  *Id.* at 209-10.  Thus, the plaintiff "did not earn incentive fee compensation under the employment agreement for loans that closed" after the month of his termination because, under the terms of the agreement, he was never entitled to those payments.  *See generally id*.

Conversely, in *Hallmon v. Advance Auto Parts, Inc*., 921 F. Supp. 2d 1110 (D. Colo. Jan. 29, 2013), the defendant employer argued that the plaintiff, a former employee, had not earned certain bonuses because a document related to his bonus plan stated that employees "must be an active Team Member at the time of payout" to receive those bonuses.  *Id.* at 1120.  The *Hallmon* court distinguished the circumstances before it from *Barnes*, noting that, in *Barnes*, the employment agreement "provided that the plaintiff *was entitled to* bonus commissions *only when* loan applications he generated during his employment resulted in a loan closure in the month during which he was termination."  *Id.* (citing *Barnes*, 787 P.2d at 210) (emphasis added).  In contrast, the court determined that the document in *Hallmon* "[did] not redefine when [the plaintiff] ha[d] earned his bonuses or when they vested," i.e., when the plaintiff had an enforceable right to

14

receive to the payments. *Id.* "Rather, it provide[d] a condition for the payment of bonuses that otherwise ha[d] already vested and [were] already determinable within the meaning of the CWCA." *Id.* Accordingly, the court denied the defendant employer's motion for summary judgment on the CWCA claim. *Id.* at 1120-21;[15] *see also Gomez*, 2018 WL 3303306, at *6-7 ("Unlike the plaintiff in *Hallmon*, Ms. Gomez was never entitled to receive a payout of her benefits. Before obtaining a right to sick leave benefits at separation, Ms. Gomez was required to work for [the defendant] for fifteen years and accrue 650 [sick leave] hours.").

With these cases in mind, the court examines the record evidence to ascertain the contours of the agreement[16] between the Parties. First, the IPL states:

> Incentive payments you may receive for Plan-to-Date achievement are a form of advance payment based on incomplete business results. Your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period. (Or, if applicable, after the date you left the Incentive Plan early.) Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have complied with the Incentive Plan; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; and (3) the customer has paid the billing for the sales or services transaction related to your incentive achievement.

[Doc. 48 at 4]. However, the QSG Provision provided that "[f]or Contracts with transactional revenue or [Annual Contract Value at Provisioning] greater than [$10 million], the achievement will be removed from everyone and all applicable elements," [Doc. 37 at 8; Doc. 46 at 1], and it is

---

[15] The *Hallmon* court noted that permitting employers to use such conditional language on already-earned wages "would allow employers to manipulate similar contractual language to avoid paying rightful wages to employees by conveniently terminating them before their payday, contravening the public policy behind the CWCA." 921 F. Supp. 2d at 1120.

[16] It is undisputed that the IPL and the Incentives Workplace, which contained the QSG Provision, governed the payment of Plaintiff's commissions. [Doc. 35-1 at 29:21-25; Doc. 35-2 at 35:25-36:20; Doc. 35-3 at 48:8-15; Doc. 46 at 1]. In referring to the IPL as an agreement, however, this court notes that it does not conclude that the IPL is an enforceable contract. *See Geras v. Int'l Bus. Machs. Corp.*, 638 F.3d 1311, 1317 (10th Cir. 2011).

undisputed that the Software Agreements met this threshold and were subject to the QSG Provision. [Doc. 35-3 at 30:3-12; 99:14-19; Doc. 46 at 1]. Finally, it is undisputed that an individual who contributed to the transaction could be paid via an incremental incentive if they were registered for the incentive, [Doc. 35-2 at 96:2-9; Doc. 35-1 at 31:11-14; Doc. 35-3 at 30:3-12; Doc. 46 at 1], but that Plaintiff was not registered for the incremental incentive. [Doc. 35-3 at 96:5-17; Doc. 46 at 1].

The court concludes that, based on the record set out above, Ms. Cahey was not entitled to receive commissions for agreements with a transactional revenue or value greater than $10 million, as the QSG Provision expressly removed such transactions from earnable achievement. [Doc. 37 at 8]. And because the Software Agreements in the HCL Transaction met this threshold, [Doc. 35-3 at 30:3-12; 99:1-19; Doc. 46 at 1], it follows that Ms. Cahey was not entitled to the commissions paid to her from those Software Agreements under the IPL. And because Ms. Cahey was never entitled to receive those commissions, they were not "earned" under the CWCA. *Barnes*, 787 P.2d at 209-10; *Gomez*, 2018 WL 3303306, at *6-7. Indeed, wages are earned, vested, and determinable under the CWCA "when an employee *has an enforceable right* to receive payment for such benefits pursuant to an employment agreement." *Gomez*, 2018 WL 3303306, at *5 (emphasis added). Here, Ms. Cahey never had such an enforceable right. *Cf. Barnes*, 787 P.2d at 210 (noting that the employee's right to compensation "and the conditions that must be satisfied to earn such compensation" are determined by the parties' employment agreement).

Plaintiff's cursory argument in her Response that the QSG Provision "did not 'apply' to [her]" does not change this result; Plaintiff provides no citations to the record, legal authority, or developed argument in support of her assertion. *See* [Doc. 46 at 1]. Indeed, although Ms. Cahey asserts that her argument is "explained below in detail (with citations)," [*id.*], the court has

reviewed Ms. Cahey's Response and has found no developed argument as to why the QSG Provision did not apply to her.  From the best the court can ascertain, Ms. Cahey asserts that the QSG Provision did not apply to her because "[n]othing in the [IQP] PowerPoint referenced the [QSG Provision]," [*id.* at 3]; the IPL did not mention the QSG Provision, [*id.* at 5]; Ms. Cahey "ha[d] always been paid commissions based on the actual amounts of sales that closed for their customers in their territories, without any 'caps' or any other reductions," [*id.* at 8]; and she did not know about the QSG Provision.  [*Id.* at 12].[17]  But none of these statements create a genuine issue of material fact that Ms. Cahey was exempted from the QSG Provision.[18]  Similarly, the undisputed fact that the IPL contained language that applied to certain salespersons but not others, *see* [Doc. 46-4 at 28:6-29:23; Doc. 50], does not create a genuine issue of material fact that the *QSG Provision* did not apply to *Plaintiff.*  Insofar as Ms. Cahey asserts that she did not know about the QSG Provision—with no citation to any legal authority demonstrating that this is material to her CWCA claim—such an assertion is insufficient to create a genuine dispute of fact as to whether her commissions were "earned" here.

Ms. Cahey nevertheless asserts various arguments as to why her commissions were "earned" here, focusing generally on the language of the IPL, that the court addresses below.  *See* [Doc. 46 at 24-25].

---

[17] Ms. Cahey also states that "[b]y its own terms, [the QSG Provision] applies only when a software deal is 'Coupled With IP and/or Partner provided Service Subcontracts or Divestiture,'" [Doc. 46 at 11], but does not argue that or cite evidence demonstrating that the Software Agreements do not fall into this category.

[18] In fact, Plaintiff's assertion that if she "had known about the [QSG Provision], she could have and would have tried to structure the HCL Deal differently so that the [Software Agreement] portion of it was under $10 million," [Doc. 46 at 15], suggests that the QSG Provision does apply to Plaintiff and the HCL Transaction.

### B.    "Earned" Upon Customer Invoice

First, Ms. Cahey argues that her commissions were "earned" when IBM invoiced the customer in the HCL Transaction.  [*Id.* at 24].  Plaintiff bases her argument on a statement purportedly made by an IBM representative in a Rule 30(b)(6) deposition in a case filed in the United States District Court for the Northern District of California, *Stephenson v. International Business Machines Corp.*, Northern District of California Civil Action No. 17-cv-1141.  *See* [Doc. 46 at 24]; *see also* [Doc. 46-36 at 21].  Ms. Cahey's reliance on this evidence, however, is problematic in several respects, and the court is unpersuaded by her argument.

***Deposition Testimony***.  Plaintiff offers no legal authority demonstrating that the court may rely on statements made in a Rule 30(b)(6) deposition of IBM in another case.  *See generally* [Doc. 46].  However, courts have indeed ruled that sworn deposition testimony taken in another case may be considered at the summary-judgment stage as an affidavit pursuant to Rule 56(c).  *See, e.g.*, *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001).  While the Tenth Circuit has not spoken on this issue, *see Coldwell*, 2018 WL 5043904, at *8, the Seventh Circuit has instructed that, to consider deposition testimony from a separate case on summary judgment, two conditions must be met.  *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014).  "First, the deposition must satisfy Rule 56's requirements for an affidavit or declaration—i.e., the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and the deponent is competent to testify on these matters." *Id.*  "Second, the depositions from the other case must be part of 'the record' in the present case, because Rule 56 states that a party must cite to 'materials in the record.'"  *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A) (emphasis in original)).  Neither of these conditions is met here.

First, Plaintiff states simply that "IBM has testified" as to certain representations; she does not identify who was deposed on behalf of IBM, the deponent's position at IBM, or the date on which the deposition occurred, nor has she submitted a copy of the deposition transcript to the court so that the court can verify that the deposition was taken under oath—indeed, the Response reflects a blank "Ex. ___". *See generally* [Doc. 46; *id.* at 24]; *see also* [Doc. 46-1 (Plaintiff's Index of Exhibits)]. The court is thus unable to determine from the record whether the testimony is based on the deponent's personal knowledge or whether the deponent is competent to testify as to the matters asserted by Plaintiff. *Alexander*, 739 F.3d at 978; *compare Coldwell*, 2018 WL 5043904, at *8 (this court considering deposition testimony from a prior case where the two deponents had been designated as the corporate defendant's designees, were represented by counsel, and where the prior case involved substantially similar allegations to the case before the court).[19]

---

[19] The court notes that Plaintiff has attached the *Stephenson* summary judgment order to her Response, which references the deposition testimony relied upon by Plaintiff here. *See* [Doc. 46-36 at 21]. While the court does not doubt the Northern District of California's vetting of the reliability of that deposition testimony, the court finds that Plaintiff has not met her burden of establishing the admissibility of the deposition testimony in this case. While "[i]t seems odd to call a formal court order inadmissible hearsay" because "a written order reduces the possibility of error and also because it tends to indicate that the contents of the order are the product of careful reflection on what is included in that order," *Mountain Highlands, LLC v. Hendricks*, No. CIV 08-0239 JB/ACT, 2009 WL 2426197, at *15 (D.N.M. July 14, 2009), *on reconsideration in part*, 2009 WL 2486047 (D.N.M. July 30, 2009), *aff'd*, 616 F.3d 1167 (10th Cir. 2010), *and aff'd*, 616 F.3d 1167 (10th Cir. 2010), Plaintiff does purport to rely on *two* out-of-court statements (the *Stephenson* order and the *Stephenson* deposition) to prove the truth of the matter asserted, i.e., that IBM considered wages "earned" when the customer was invoiced. But Plaintiff bears the burden of establishing the admissibility of hearsay evidence, *see Romero v. Helmerich & Payne Int'l Drilling Co.*, No. 15-cv-00720-NYW, 2016 WL 11692094, at *7 (D. Colo. Oct. 13, 2016), and she offers no exception to the general rule barring hearsay statements that would apply in this case. *See generally* [Doc. 46]; *see also Bryant v. Colorado*, No. 16-cv-01638-NYW, 2018 WL 2445831, at *6 (D. Colo. May 31, 2018) (determining that deposition testimony offered for the truth of the matter asserted was inadmissible hearsay). Plaintiff has thus not met her burden of establishing that such evidence would be admissible at trial and can be considered by the court here. *See Gross*, 53 F.3d at 1541 ("It is well settled in this circuit that we can consider only admissible evidence in reviewing . . . summary judgment.").

Second, as set out above, Ms. Cahey has not attached a copy of the deposition transcript to her Response, and thus the transcript is not part of the record before the court.  To satisfy this requirement, Ms. Cahey "needed to create a docket entry, with attachments, to ensure that the relevant . . . materials were part of the record in [her] case."  *Alexander*, 739 F.3d at 978.  By failing to file the transcript in this case, Ms. Cahey has precluded the court's ability to consider that transcript here.  *See id.*; *cf. Wennerstrom v. City & Cty. of Denver*, No. 19-cv-03251-NYW, 2021 WL 1339396, at *11 (D. Colo. Apr. 9, 2021) (finding that the nonmovant had failed to create a genuine dispute of material fact where, in attempting to do so, she "cite[d] to deposition testimony not before the court on the instant Motion.").  As a result, the court cannot rely on any out-of-court deposition testimony referenced by Plaintiff here.

***Evidence of Customer Invoice***.  Setting aside the deposition testimony not properly before the court, the court nevertheless concludes that Plaintiff has failed to support her assertion that the commissions were "earned" when the customer was invoiced, as there is no evidence before the court demonstrating that such invoice occurred.  In her Response, Ms. Cahey states that the customer was invoiced for one of other contracts in the HCL Transaction[20] on June 30, 2019, and that "there is no evidence that IBM did not issue the invoice for the [Software Agreements] deal on June 30, 2019."  [Doc. 46 at 9, 24].  But in order to establish a genuine dispute of fact, a party "must support the assertion by . . . citing to particular parts of materials in the record, . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

---

[20] Plaintiff states that the invoice for "one of the HCL Deals" was submitted on June 30, 2019, but does not define "HCL Deals."  [Doc. 46 at 24].  Because this is not material to the resolution of the Motion for Summary Judgment, the court will assume that Plaintiff is referring to one of the other contracts associated with the HCL Transaction.

56(c)(1).  By simply asserting that a different invoice was issued, drawing an assumption that the

Software Agreement invoice must have been issued on the same date, and asserting that there is

no evidence to show that such invoice *did not* issue, Ms. Cahey has not created a genuine dispute

here.[21]  *Wagner v. Discover Bank*, No. 12-cv-02786-MSK-BNB, 2014 WL 128372, at *3 (D. Colo.

Jan. 13, 2014).[22]  As such, the court finds that Ms. Cahey has not established a genuine dispute of

fact as to whether the commissions were "earned" when the customer was invoiced.

### C.    "Earned" at the End of the Plan Period

In the alternative, Ms. Cahey argues that the commissions were "earned" upon "the end of

the plan period when her sales were measured," seemingly based on the IPL language providing

that commissions are earned "only after the measurement of complete business results following

the end of the full-Plan period."  [Doc. 46 at 25]; *see also* [Doc. 48 at 4].  In support, she relies on

the extraneous deposition testimony that this court cannot consider.  *See* [Doc. 46 at 25].

Nevertheless, the court will briefly address Plaintiff's argument.  As set forth above, the IPL states

in pertinent part:

> Incentive payments you may receive <u>for Plan-to-Date achievement</u> are a form of
> advance payments based on incomplete business results.  Your incentive payments
> are earned under the Plan terms, and are no longer considered Plan-to-Date advance

---

[21] Where the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy
its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on
an essential element of the nonmovant's claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664,
671 (10th Cir. 1998) (citation omitted).  But here, Plaintiff bears the ultimate burden of persuasion
at trial with respect to her CWCA claim; thus, she cannot rely on a lack of evidence to demonstrate
the existence of an assumed fact.  Insofar as there may be other record evidence not cited by
Plaintiff which demonstrates an invoice was issued for the Software Agreements, the court has no
obligation to "'comb the record' of possible facts and evidence in order to make Plaintiff['s] case
for [her]."  *Johnson v. Am. Nat'l Prop. & Cas. Cos.*, No. 17-cv-02218-WJM-KMT, 2019 WL
463026, at *5 (D. Colo. Feb. 6, 2019) (citing *Adler*, 144 F.3d at 672).

[22] Similar to the instant case, the plaintiff in *Wagner* assumed that he never received a copy of a
cardmember agreement because he could not find a copy of the agreement in his file and attempted
to use this assumption to create a genuine dispute of fact.  2014 WL 128372, at *3.  The court
found that this assumption was insufficient to create a genuine dispute.  *Id.*

payments, only after the measurement of complete business results following the
end of the full-Plan period.

[Doc. 48 at 4 (emphasis added)].   Thus, by the plain language of the IPL, payments that are

"earned" "only after the measurement of complete business results" are limited to payments that

are received for Plan-to-Date achievement—and the QSG Provision expressly *excludes*

transactions valued at over $10 million, including the Software Agreements, from earnable

achievement.  *See* [Doc. 37 at 8 ("For Contracts with transactional revenue or [Annual Contract

Value at Provisioning] greater than $10M, the achievement will be removed from everyone and

all applicable elements.")].  Thus, insofar as Plaintiff asserts that the commissions were "earned"

pursuant to the IPL because she was paid commissions for the Software Agreements after the "end

of the full-Plan period," the court disagrees: the incentive payments earned "after the measurement

of complete business results" expressly do not include the commissions excluded from earnable

achievement by the QSG Provision.

### D.    "Earned" Upon Commission Claw Back

Next, Plaintiff contends that the commissions were "earned" under the IPL when IBM

clawed them back.  [Doc. 46 at 24].  However, Ms. Cahey does not clearly explain this argument;

the entirety of her argument on this point is as follows:

> In any event, the commissions were "earned" under the terms of the IPL here when
> IBM clawed them back.  Notably, IBM does not address the IPL's definition of the
> term 'earned' in its brief; rather, IBM argues only that the Quota Setting Guidelines
> allowed the claw back, which ignores the preliminary and necessary question of
> whether the commissions were "earned" when those guidelines were applied.  (Dkt.
> No. 35 at 10-13).  Thus, IBM has not carried its burden at summary judgment to
> show that there is no genuine issue of material fact as to this issue.

[*Id.*].  Plaintiff does not explain why the clawing-back of the commissions rendered them "earned"

under the terms of the IPL.  *See generally* [*id.*].

Absent developed argument from Plaintiff, the court is unable to ascertain her exact argument, and it is not the court's duty to construct arguments on behalf of the Parties. *Jackson-Cobb v. Sprint United Mgmt.*, 173 F. Supp. 3d 1139, 1145 (D. Colo. 2016).  To the extent Ms. Cahey argues that, because IBM's claw back occurred "after the measurement of complete business results following the end of the full-Plan period," the commissions were then "earned" under the IPL, *see* [Doc. 46 at 24]; [Doc. 48 at 4], for the reasons set forth above, the language upon which Plaintiff relies does not apply to the excluded Software Agreement commissions, as such amounts were expressly excluded from earnable achievement.  In addition, the IPL also expressly reserves to IBM:

> [T]he right to review, and in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives.  Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released.

[Doc. 48 at 5].  Ms. Cahey has not come forward with sufficient facts to permit this court to conclude that there is a genuine issue of material fact as to whether IBM's claw back somehow triggered the subject commission to be "earned" in light of this language.  The court is thus not convinced by this argument.

### E.    Established Practice or Course of Conduct

Finally, Plaintiff argues that her CWCA claim "should go to the jury" because "IBM had an established practice and course of conduct of always paying full commissions, without any mention of the [QSG Provision], and that is enough to establish an agreement to pay commissions without limitation."  [Doc. 46 at 24].  Plaintiff is correct that the inquiry as to whether wages are "earned" pursuant to an employment agreement is not necessarily limited to compensation "explicitly authorized by the agreement." *Coldwell*, 2018 WL 5043904, at *5.  However, Plaintiff

cites no legal authority or record evidence in support of her contentions.  *See* [Doc. 46 at 24].

Upon review of the record evidence and applicable case law, the court is unpersuaded by Plaintiff's argument.

In *Coldwell*, the defendant employer argued that the plaintiffs' CWCA claim for unpaid overtime wages, which plaintiffs asserted they were owed under the Fair Labor Standards Act ("FLSA"), was subject to dismissal on the grounds that the CWCA "does not contain a substantive entitlement to overtime pay" and because the employment agreement contained no overtime-pay provisions.  2018 WL 5043904, at *10.  The court rejected that argument, finding that the CWCA permitted the plaintiffs to pursue claims for wages owed to them by statute.  *Id.* at *11.  More specifically, the court noted that the plaintiffs "had done work that, under FLSA and related laws, entitled them to compensation," and further found that the CWCA "supported their claim because CWCA operates as an enforcement mechanism for employees to collect wages to which they are entitled."  *Id.*  In other words, the general proposition that the employment agreement is used to determine whether and when wages are "earned" under the CWCA does not preclude an employee from seeking overtime wages to which she is otherwise legally entitled, such as pursuant to federal statute.  *See generally id.*; *see also Hernandez v. Ray Domenico Farms, Inc.*, 414 P.3d 700, 703 (Colo. 2018) (determining that the CWCA permits workers to seek unpaid overtime allegedly owed to them pursuant to the FLSA).

However, the court does not find *Coldwell* particularly analogous here, as Plaintiff does not seek wages that are owed pursuant to a statute, i.e., wages to which Plaintiff undoubtedly has an enforceable right to receive payment.  Rather, Plaintiff appears to argue that IBM's course of conduct has amended or otherwise affected when her wages are deemed "earned" under the CWCA.  But Plaintiff has cited no authority demonstrating that the Parties' course of conduct may

alter or amend the terms of an express agreement with respect to whether commissions are "earned" or not; indeed, the court respectfully finds that the two cases cited by Plaintiff do not strongly support her position.

First, in *Lozoya v. AllPhase Landscape Construction, Inc.,* 12-cv-01048-JKL, 2015 WL 1757080 (D. Colo. Apr. 15, 2015), the plaintiff employees moved for summary judgment on their CWCA claim on the basis that the defendant employer had a written policy of not paying employees for time spent traveling to job sites. *Id.* at *1-2. In opposition, the employer argued that, despite its written policy, its actual practice was to pay employees for travel time. *Id.* at *2. The court concluded that summary judgment was inappropriate "because there [were] factual disputes as to whether and how Defendant's policy was applied in practice, to which employees, and under what circumstances." *Id.* at *3. But a genuine dispute of fact as to whether employees were or were not paid wages is distinguishable from a genuine dispute of fact as to whether wages were earned—and *Lozoya* does not stand for the proposition that the Parties' course of conduct can amend an express written agreement.

Moreover, in *Kirkland v. Robert W. Baird & Co., Inc.*, the plaintiff sued his former employer, alleging that the employer breached the parties' employment contract and violated the CWCA by failing to pay the plaintiff for commissions owed to him for recruits he brought to the employer. 2020 WL 1452165, at *5 (D. Colo. Mar 25, 2020). The employer argued that it was entitled to summary judgment on the plaintiff's breach of contract claim because it had a policy to not pay commissions for recruits who were unemployed prior to being hired by the employer. *Id.* at *7. While the court did, indeed, consider whether the plaintiff had sufficiently made a showing that "he was owed commissions that were earned, vested, and determinable under the terms of the Offer *and the parties' course of conduct*," *id.* at *8 (emphasis added), there was evidence that the

parties had "modified the terms of [the plaintiff's] employment through their course of conduct," *id.* at *2, and the parties each acknowledged that the terms of the offer letter—i.e., the parties' written employment agreement—had been modified by the parties' conduct; their dispute was over *how* their conduct modified the offer's terms. *Id.* at *5.[23]

The same is not true here, where Ms. Cahey has not set forth any evidence that the IPL and Incentives Workplace documents were amended by IBM's later acts. Indeed, while Ms. Cahey argues that "IBM had an established practice and course of conduct of always paying full commissions, without any mention of the $10 million provision," [Doc. 46 at 24], the evidence submitted by Plaintiff does not create a genuine dispute of fact as to when commissions were "earned." Although Ms. Cahey does not directly cite evidence in support of her argument, *see* [*id.*], the court has reviewed her filings and has considered the cited evidence which might create a genuine dispute as to whether the Parties had an agreement—outside of the express terms of the IPL and Incentives Workplace, and notwithstanding those terms—that her commissions would essentially never be limited or that she had, in fact, earned the commission associated with the HCL transaction. *But see Johnson v. Am. Nat'l Prop. & Cas. Cos.*, No. 17-cv-02218-WJM-KMT, 2019 WL 463026, at *5 (D. Colo. Feb. 6, 2019) (the court is not "under any obligation 'to comb the record' of possible facts and evidence in order to make [a party's] case for them."). The court does not find that that such a genuine dispute is present here.

---

[23] The court ultimately concluded that, because "neither the terms of the Offer not any modification of its terms by course of conduct" spoke to the defendant's framing of its commission policy, the plaintiff had made a prima facie breach-of-contract showing. *Kirkland*, 2020 WL 1452165, at *7. The court then determined that "[t]he showing with regard to the first claim for breach of contract [was] sufficient for" the plaintiff's CWCA claim, and denied the defendant summary judgment on that claim. *Id.* at *8.

For example, Ms. Cahey asserts evidence that IBM employees believe that IBM does not cap commissions. *See, e.g.*, [Doc. 46-3 at 22:10-23:17 (Megan McCracken[24] stating in her deposition that it is "know that commissions are not capped" and that it has "always been [her] observation" that commissions are not capped); Doc. 46-2 at 88:3-4 (Ms. Cahey stating that it is "a known thing that your commissions are uncapped")].   But the fact that IBM employees believe that IBM does not cap commissions—i.e., does not place an upper limit on commissions—does not create a genuine dispute of fact as to whether Ms. Cahey was entitled to, and thus earned, commissions which were expressly removed from earnable achievement in the QSG Provision.[25] In addition, Ms. Cahey submits an affidavit from Mr. Williams, as well as an affidavit from herself, in which they both aver that during their entire time at IBM, they were "always paid based on the commissions formulas in [the IQPs]—meaning that [they were] paid based on the actual amounts of sales that closed for customers in [their] territory, without any 'caps' or other reductions." [Doc. 46-32 at ¶ 4; Doc. 46-33 at ¶ 2].   But this evidence does not demonstrate that IBM altered the express agreement contained in the QSG Provision through its course of conduct with Ms. Cahey.

The closest that Ms. Cahey comes is to offer the affidavit of Kimberly Seithel, who attested that "[i]n the fall of 2019 IBM clawed back some of the commissions that I earned on the HCL deal, but repaid them after I sent a letter to IBM, through counsel, demanding that IBM not claw back these commissions.  Since that letter, IBM has not clawed back any money from me." [Doc. 46-35 at ¶ 3].   But Ms. Cahey does not argue that or explain how IBM's course of conduct with

---

[24] Ms. McCracken was Plaintiff's manager during the first half of 2019.  [Doc. 35 at ¶ 6; Doc. 46 at 1].

[25] Moreover, the court notes that despite Plaintiff's emphasis on evidence regarding IBM's purported policy of not instituting caps on commissions, Plaintiff never actually argues in her Response that the claw back of the Software Agreement commissions constituted a "cap" on her commissions.  *See* [Doc. 46].

Ms. Seithel can create a genuine issue of material fact that there was an established course of conduct to which *Ms. Cahey* was subject that made the commission "earned." *See* [Doc. 46 at 16, 24]. Although the court must draw all reasonable inferences in favor of Ms. Cahey, there are insufficient facts in the record to permit a factfinder that IBM had a course of conduct to ignore the QSG Provision as applied to Ms. Cahey or others. For instance, Ms. Cahey points to no other transactions valued over $10 million for which she earned commissions despite the QSG Provision. *See Miller v. Foster*, No. 12-cv-02525-RM-MJW, 2013 WL 2423130, at *3 (D. Colo. June 4, 2013) (the court cannot "assume that a plaintiff can prove facts that have not been alleged"); *Blea v. Barnhart*, 466 F.3d 903, 912 (10th Cir. 2006) (an inference is not reasonable if it does "not necessarily flow from the facts"). Indeed, even as to the HCL deal, the record reflects that Ms. Seithel is the outlier, not the norm.

Even if Ms. Cahey could rely upon IBM's course of conduct with Ms. Seithel, an argument not expressly made by Plaintiff, it is not even clear when, as compared to Ms. Cahey, Ms. Seithel's repayment occurred such that there would be a genuine issue of material fact that there was an "established" course of conduct as to Ms. Cahey. *See* [Doc. 46-35 (failing to indicate when IBM clawed back or repaid Ms. Seithel's commissions)]. Ms. Cahey argues both that her commissions were earned at the end of the Plan period—which she asserts occurred on June 30, 2019, *see* [Doc. 46 at 2, 25], or that they were earned when IBM clawed back the commissions, which she asserts began in November 2019. *See* [*id.* at 15, 24]. But Plaintiff cites to no legal authority, and this court's independent research has uncovered no authority, suggesting that the Parties could amend their agreement by conduct occurring *after* when Ms. Cahey argues her commissions were "earned." *See generally* [*id.*]. Indeed, the one case relied upon by Plaintiff—*Kirkland*—is readily distinguishable from the instant matter, as the parties in that case concurred that their agreement

had been modified and that such modification occurred prior to the event giving rise to the dispute concerning whether certain wages were "earned." *See* 2020 WL 1452165, at *5. Simply put, "an effect logically cannot occur before its cause," *Stafford-Fox v. Jenkins*, 639 S.E.2d 610, 622 (Ga. App. 2006) (Andrews, J., concurring (quotation omitted)), and Plaintiff has not established a genuine dispute of fact suggesting a course of conduct based on IBM's purported repayment to Ms. Seithel.[26]

For these reasons, the court does not find that the repayment to Ms. Seithel—the alleged "course of conduct"—which occurred prior to when Ms. Cahey argues she "earned" the commissions, creates a genuine dispute concerning whether, *due to that course of conduct*, the commissions were, indeed, earned. *Cf. Araujo v. Trustees of Bos. Coll.*, No. 80-84-K, 1983 WL 649, at *6 (D. Mass. Dec. 16, 1983) (plaintiff's promotion *prior* to college president's tenure was insufficient to establish genuine dispute of fact as to the college's promotion practices and procedures during the president's tenure); *LaPine v. Corizon Inc.*, No. 2:18-cv-10750, 2020 WL 5884710, at *5 (E.D. Mich. Mar. 31, 2020) (no genuine dispute of fact to preclude summary judgment on retaliation claim where retaliatory conduct occurred before the protected activity, and thus a causal connection was "impossible"). At bottom, Plaintiff has presented no actual evidence demonstrating that IBM engaged in a course of conduct demonstrating "an agreement to pay

---

[26] The court further notes that it is undisputed that Plaintiff accepted the terms of the IPL on January 17, 2019, which defined her Plan as being governed by the Incentives Workplace, which included the QSG Provision, *see* [Doc. 35-1 at 44:9-12; *id.* at 48; Doc. 35-2 at 35:25-36:20, 52:25-53:11, 95:9-11; Doc. 35-2 at 52:14-20; Doc. 35-4 at 16:15-17:13; Doc. 37 at 8; Doc. 46 at 1], and that, prior to the closing of the HCL Transaction, Ms. Cahey was informed by her manager that commissionable revenue from that Transaction *would not* flow to the sales representatives. [Doc. 35-1 at 94:4-11; 987:16-98:4; Doc. 46 at 1]. Plaintiff cites no evidence from which the court could draw a reasonable inference that, between the representation to Plaintiff that she would not earn commissions for the HCL Transaction and either the close of the Plan period or November 2019, IBM created "an established practice and course of conduct" of "always paying full commissions." *See generally* [Doc. 46].

commissions without limitation."   [*Id.* at 24].   A district court has "no obligation to comb the record when [the] cited evidence [does] not support [the] factual allegations."   *Garcia v. City of Farmington*, 715 F. App'x 810, 814 (10th Cir. 2017) (unpublished).   "A factual dispute is 'genuine' and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party."   *Copper Oaks Master Home Owners Ass'n v. Am. Fam. Mut. Ins. Co.*, 416 F. Supp. 3d 1115, 1121 (D. Colo. 2019).   "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant."   *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997).

The court finds that Plaintiff has not provided sufficient evidence to demonstrate a genuine dispute of fact concerning whether the commissions erroneously paid to her were "earned" under the CWCA, which is a prerequisite to success on such a claim.   Colo. Rev. Stat. § 8-4-101(14)(a)(II).   Accordingly, the court **GRANTS** summary judgment in favor of IBM and against Plaintiff as to Claim 5.[27]

## II.   Quantum Meruit and Unjust Enrichment

Next, IBM seeks summary judgment on Plaintiff's quantum meruit and unjust enrichment claims, Claims One and Two.   [Doc. 35 at 14].[28]   "Quantum meruit is an equitable theory of recovery that arises out of the need to avoid unjust enrichment to a party in the absence of an actual

---

[27] In light of this conclusion, the court does not address IBM's alternative argument.   *See* [Doc. 35 at 13].

[28] IBM does not argue that Plaintiff's quantum meruit or unjust enrichment claims fall with her CWCA, *see generally* [Doc. 35], and the court does not find that they do.   Whether or not the commissions were "earned" under the CWCA is not an element of Plaintiff's unjust enrichment or quantum meruit claims and thus has no bearing on whether there was an unjust retention of a benefit here.

agreement to pay for services rendered." *Tegu v. Vestal Design Atelier LLC*, 407 F. Supp. 3d 1171, 1181 (D. Colo. 2019) (quoting *Melat, Pressman & Higbie, L.L.P. v. Hannon L. Firm, L.L.C.*, 287 P.3d 842, 847 (Colo. 2012)).  In Colorado, the doctrine of quantum meruit is synonymous with the doctrine of unjust enrichment,[29] *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000), and "does not depend on the existence of a contract, either express or implied in fact" but rather "seeks to restore fairness when a contract fails by ensuring that the party receiving the benefit of the bargain pays a reasonable sum for that benefit." *Matter of Gilbert*, 346 P.3d 1018, 1023 (Colo. 2015) (internal quotation marks omitted); *see also Van Zanen v. Qwest Wireless, L.L.C.*, 522 F.3d 1127, 1130 (10th Cir. 2008) (explaining that, under Colorado law, "unjust enrichment is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another," and "centers [its] attention on the prevention of injustice." (citations and internal quotation marks omitted)).

     "To recover in quantum meruit, a plaintiff must demonstrate that (1) at plaintiff's expense, (2) defendant received a benefit, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Melat*, 287 P.3d at 847.  A plaintiff must make the same showing to recover on an unjust enrichment claim. *CadleRock Joint Venture LP v. Esperanza Architecture & Consulting, Inc.*, --- P.3d ----, 2021 WL 3921503, at *4 (Colo. App. 2021).  "Whether retention of the benefit is unjust is a fact-intensive inquiry in which courts look to, *among other things*, the intentions, expectations, and behavior of the parties." *Melat*, 287 P.3d at 847 (emphasis added).

---

[29] For this reason, the court considers Claims 3 and 4 together and applies the same legal standards to both Claims.

Here, IBM argues that Ms. Cahey "has no basis to claim that IBM's recovery of erroneously paid commissions on the 2019 HCL Transaction was unjust" because she could not have had a reasonable expectation to receive commissions from that Transaction. [Doc. 35 at 15]. More specifically, IBM asserts that the Plan documents "expressly carved out from commission earnings the very transaction for which Plaintiff now seeks to recover commission payment" and she "ha[d] no reason to think the QSG [P]rovision [did] not apply." [*Id.*]. For this reason, IBM seeks summary judgment on Plaintiff's quantum meruit and unjust enrichment claims. [*Id.*]. In response, Ms. Cahey asserts that the QSG Provision "was not included in any of the primary documents that salespeople do read, like the IQP PowerPoint," the amendment adding the QSG Provision was not highlighted to her, and thus she did not know the QSG Provision existed. [Doc. 46 at 21]. She argues that she "undisputedly had an expectation of payment, as demonstrated by the documents" and that it "will be for a jury to decide, given all of the facts, whether that expectation was reasonable." [*Id.* at 22]. Because Defendant does not argue that it did not receive a benefit at Plaintiff's expense and instead focuses its argument on the third element of both claims: whether the circumstances here would render Defendant's retention of the commission payment unjust, *see* [Doc. 35], the court does the same.

However, the court is respectfully not persuaded by Defendant's argument that Plaintiff's claims fall because she cannot show that she had a reasonable expectation of payment. The Colorado Supreme Court has clarified that reliance (or a reasonable expectation that the claimant will receive compensation) is not a requisite element of an unjust enrichment claim. *Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788, 800 (Colo. 1991) (finding error in the trial court's jury instruction that, in order to find for the plaintiff on an unjust enrichment claim, the jury had to find that the plaintiff acted "with the reasonable expectation that it would be paid the

reasonable value of the corn by the Defendant"); *see also Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 923 (10th Cir. 2018) (discussing *Ed Duggan* and stating that "[w]hether a plaintiff had a reasonable expectation of payment—while potentially relevant to the unjustness inquiry—is not itself an element of unjust enrichment under Colorado law.").

In *Menocal*, the Tenth Circuit reviewed the district court's certification of a class raising an unjust enrichment claim. *Id.* at 910-11. On appeal, the defendant argued that the class's questions of law or fact did not predominate over questions affecting individual members because the common evidence "[could not] establish a reasonable expectation of payment on the part of class members." *Id.* at 925. The Tenth Circuit rejected this argument on the basis that "Colorado law does not require such a showing as an element of unjust enrichment." *Id.* In reaching this conclusion, the Tenth Circuit relied on *Ed Duggan* and the fact that "post-*Ed Duggan* Colorado Supreme Court cases involving unjust enrichment claims have not required plaintiffs to show a reasonable expectation of payment by the defendant." *Id.* at 926 (citing *City of Arvada ex rel. Arvada Police Dep't v. Denver Health & Hosp. Auth.*, 403 P.3d 609, 616-17 (Colo. 2017)).

While stated in a different procedural posture than is presently before the court, the Tenth Circuit's analysis of the elements of an unjust enrichment (or quantum meruit) claim in Colorado is instructive here. Indeed, just this year, the Colorado Court of Appeals confirmed that the elements of an unjust enrichment or quantum meruit claim are (1) a benefit was conferred by the plaintiff; (2) on the defendant; (3) under circumstances which would make retention of the benefit unjust, *CadleRock*, 2021 WL 3921503, at *5, and the Colorado Supreme Court does not require plaintiffs to show a reasonable expectation of payment to succeed on such a claim. *See Denver Health & Hosp. Auth.*, 403 P.3d at 616-17. And although the court does not disagree with Defendant's assertion that whether Plaintiff had a reasonable expectation of payment is *relevant*

to the unjustness inquiry, *see* [Doc. 35 at 15], "[t]he fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, . . . does not transform reliance into an element of the cause of action." *Trejo v. Xclusive Staffing, Inc.*, No. 17-cv-01602-RM-MJW, 2018 WL 4372724, at *5 (D. Colo. May 16, 2018) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008)). Thus, contrary to Defendant's argument, a showing that Plaintiff reasonably expected payment from Defendant is not required to succeed on an unjust enrichment or quantum meruit claim; rather, it is one of many things to consider in determining whether the retention of a benefit is unjust. *Menocal*, 882 F.3d at 926.

For these reasons, this court declines to base its summary-judgment ruling on the absence of a reasonable expectation of payment. *See Luttgen v. Fischer*, 107 P.3d 1152, 1157 (Colo. App. 2005) ("Unlike the claims for promissory estoppel and negligent misrepresentation, a plaintiff need not demonstrate justifiable reliance to succeed on a claim of unjust enrichment. . . . Because reliance is not an element of an unjust enrichment claim, the court erred in basing this part of its summary judgment ruling on this ground."). Even if Defendant were correct that Plaintiff cannot demonstrate that she had a reasonable expectation of payment, "Colorado law does not require such a showing." *Menocal*, 882 F.3d at 925. The court thus finds that IBM has not demonstrated that it is entitled to summary judgment as a matter of law, and thus, the burden never shifted to Plaintiff to establish a genuine dispute of fact to defeat summary judgment on her unjust enrichment and quantum meruit claims. *See Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) ("Before the burden shifts to the nonmoving party to demonstrate a genuine issue, the moving party must meet its 'initial responsibility' of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law."); *cf. Leprino Foods Co. v. DCI, Inc.*, 727 F. App'x 464, 474 (10th Cir. 2018) (unpublished) (where the moving party failed

to adequately establish an issue in moving papers, the burden to establish the merits of a claim did not shift to nonmoving party).

For these reasons, the court finds that IBM has failed to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on Claims One and Two. As a result, the Motion for Summary Judgment is **DENIED** with respect to Plaintiff's unjust enrichment and quantum meruit claims.[30]

## III.    Declaratory Judgment

Finally, Defendant seeks summary judgment on Plaintiff's declaratory judgment claim. [Doc. 35 at 16].  In her Complaint, Ms. Cahey sought a declaratory judgment that "IBM has no right to recover the commissions paid to Plaintiff[] for the HCL deal and Plaintiff[] ha[s] the right to be paid commissions that they have earned up to the date of filing and that [she] may earn thereafter."  [Doc. 1 at ¶ 129].  In her Response to the Motion for Summary Judgment, Plaintiff states that "[b]ecause IBM has not fully clawed back the commissions, this claim is now moot." [Doc. 46 at 26].  In its Reply, IBM agrees that the claim is moot.  [Doc. 50 at 8].

Because the Parties agree that the claim is moot, the court does not find judgment in favor of Defendant appropriate, as a judgment would constitute a ruling on the merits.  *Cf. Corey v. Pro. Rodeo Cowboy Ass'n, Inc.*, No. 18-cv-01682-WJM-KMT, 2020 WL 7319082 (D. Colo. Dec. 11, 2020) ("If a case is moot, a court lacks authority to make a ruling on the merits.").  Plaintiff, however, has not moved to dismiss her declaratory judgment claim, nor could she do so via voluntary dismissal under Rule 41 of the Federal Rules of Civil Procedure.  *Hawkinson v. Obrien*, No. 18-cv-03022-PAB-KMT, 2020 WL 3619557, at \*3 (D. Colo. July 2, 2020); *see also Gobbo*

---

[30] Given the legal authority as to the overlap between quantum meruit and unjust enrichment, *see CadleRock*, 2021 WL 3921503, at \*4, this court also issues an Order to Show Cause to Plaintiff as to why these separately pled claims should not be construed as a single cause of action.

*Farms & Orchards v. Poole Chem. Co.*, 81 F.3d 122, 123 (10th Cir. 1996) (finding that Rule 41(a) "speaks to dismissal of an action, not just a claim within an action" and finding no authority "to support [the plaintiff's] contention that Rule 41(a) applies to dismissal of less than all claims in an action").[31]

However, the Tenth Circuit has indicated that "[b]ecause mootness is a matter of jurisdiction, a court may raise the issue sua sponte." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996); *see also MacIntyre v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 13-cv-01647-WJM-MEH, 2014 WL 3809496, at *6 (D. Colo. Aug. 1, 2014).   Here, Plaintiff's declaratory judgment claim seeks a judgment that IBM's then-clawing back of her commissions was unlawful, *see* [Doc. 1 at ¶ 126], which Plaintiff represents is no longer occurring.  [Doc. 46 at 26].  Moreover, the Parties' Final Pretrial Order states that Plaintiff will pursue quantum meruit, unjust enrichment, and CWCA claims at trial, but that "IBM has now clawed back all of the commissions supposedly due, so there is no longer any need for a declaratory judgment," [Doc. 53 at 1 n.1], and that "this Final Pretrial Order will control the subsequent course of this action and the trial . . . [and] [t]he pleadings will be deemed merged herein."  [*Id.* at 14].  Indeed, "[a]t this point in the proceeding, the Final Pretrial Order governs the claims at issue in this case." *Dry Clean Super Ctr., Inc. v. Kwik Indus., Inc*., No. 08-cv-00578-WJM-CBS, 2012 WL 503510, at *4 (D. Colo. Feb. 15, 2012).  The court thus finds, and the Parties agree, that Plaintiff's declaratory judgment claim, Claim 6, is now moot.  As a result, the court will *sua sponte* **DISMISS** Plaintiff's Claim 6 as moot.

---

[31] The proper procedure to dismiss fewer than all claims in an action is to file an amended complaint.  *See Hawkinson*, 2020 WL 3619557, at *3; *see also* 9 Charles Alan Wright et al., Federal Practice & Procedure § 2362 (3d ed.) ("A plaintiff who wishes to drop some claims but not others should do so by amending his complaint pursuant to Rule 15.").

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)   Defendant's Motion for Summary Judgment [Doc. 35] is **GRANTED in part** and **DENIED in part**, consistent with the rulings herein;

(2)   Summary judgment in favor of Defendant IBM and against Plaintiff Nancy Cahey is **GRANTED** as to Plaintiff's claim under the Colorado Wage Claim Act (Claim 5);[32]

(3)   Plaintiff's declaratory judgment claim (Claim 6) is **DISMISSED as moot**; and

(4)   Plaintiff shall **SHOW CAUSE** as to why her quantum meruit claim (Claim 3) and her unjust enrichment claim (Claim 4) should not be consolidated into a single cause of action no later than **November 26, 2021**.

DATED:  November 18, 2021                     BY THE COURT:

Nina Y. Wang
United States Magistrate Judge

---

[32] The court will order that the Clerk of Court enter final judgment in favor of Defendant on Plaintiff's CWCA claim at such time as the Clerk enters final judgment on all claims in this action.